FILED
2023 May-03 PM 01:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JALEN MURPHY,           )
                             )
     **Plaintiff,**          )
                             )
**v.**                      )    **Case No.: 2:20-cv-01124-MHH**
                             )
**STEVEN WILKINSON et al**    )
                             )
     **Defendants.**      )

## MEMORANDUM OPINION AND ORDER

In this action, plaintiff Jalen Murphy seeks damages from City of Hoover police officers Steven Wilkinson, Jonathan Chambless, Brett Pace, and Kyle McCreless in their individual capacities. (Doc. 8). Mr. Murphy contends that the officers used excessive force when they arrested him. (Doc. 8). The officers have asked the Court to enter judgment in their favor on Mr. Murphy's claims based on the affirmative defense of qualified immunity. (Docs. 42, 43, 48). In this opinion, the Court examines the parties' evidence to determine whether Mr. Murphy's claim against each of the defendants survives the defendants' motion for summary judgment.

The opinion begins with a discussion of the standard that a district court uses to evaluate a Rule 56 motion for summary judgment. Then, consistent with that standard, the Court provides a description of the parties' summary judgment evidence, focusing on video evidence of Mr. Murphy's interaction with police. Finally, the Court evaluates the evidence, applying the legal standard for qualified immunity.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Generally, when considering a summary judgment motion, a district court must view the parties' evidence and reasonable inferences from that evidence in the

light most favorable to the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). When there is camera footage in the record, a district court must accept "facts clearly depicted" in the video recordings, even when the recorded facts contradict the plaintiff's description of events. *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). A court does so because "where a video in evidence 'obviously contradicts [the nonmovant's] version of the facts," a court must "'accept the video's depiction instead of [the nonmovant's] account,' *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010), and 'view[] the facts in the light depicted by the videotape,' *Scott*, 550 U.S. at 380–81, 127 S.Ct. at 1776." *Shaw*, 884 F.3d at 1098. When a recording does not "clearly depict an event or action, and there is evidence going both ways on it," *Shaw*, 884 F.3d at 1097 n.1, a district court must credit the plaintiff's version of an event.

## II.

The facts revealed by audio and video recordings and recounted by Mr. Murphy are these: on October 29, 2019, shortly before 1:00 a.m., Mr. Murphy went for a walk around the large apartment complex where he lived in Hoover, Alabama. (Doc. 41-3, pp. 50). He often walked at night to reduce flare-ups from Crohn's disease. (Doc. 41-3, p. 14, tp. 51).

3

Hoover police officer Steven Wilkinson was patrolling the apartment complex that night.  (Doc. 41-1, p. 56; Doc. 41-8, 5:40-5:42).  Shortly before 1:00 a.m., he reported to dispatch that he saw a suspicious person behind the apartment building at 5000 Summer Place.  (Doc. 41-2, pp. 53-54).  The person was Mr. Murphy.  When Mr. Murphy walked past Officer Wilkinson's patrol SUV, Officer Wilkinson pulled forward to meet Mr. Murphy.  (Doc. 41-3, p. 14, tp. 52).[1]  Officer Wilkinson exited his vehicle and screamed at Mr. Murphy.  (Doc. 41-3, p. 14, tp. 52).  Mr. Murphy stopped, and he removed his hands from his pockets when Officer Wilkinson instructed him to do so.  (Doc. 41-4, 0:09-0:10).[2]  Mr. Murphy asked if he had done anything wrong, and Officer Wilkinson replied that it was "weird" for someone to be walking around "at 1:00 in the morning."  (Doc. 41-4, 0:23-0:25).

Mr. Murphy did not have identification.  (Doc. 41-4, 0:17-0:20).  When Officer Wilkinson asked Mr. Murphy his name, Mr. Murphy responded with a question, asking Officer Wilkinson why he was being detained.  (Doc. 41-4, 0:37 to 0:42).  Officer Wilkinson instructed Mr. Murphy to cooperate by giving his name and address so that Officer Wilkinson could verify the information.  (Doc. 41-4, 0:51 to 1:00).  Mr. Murphy then told Officer Wilkinson his name and asked Officer

---

[1] According to Officer Wilkinson, when Mr. Murphy walked past his patrol SUV, he smelled marijuana.  (Doc. 41-8, 5:47-5:48).

[2] Officer Wilkinson's bodycam recording begins as he walks up to Mr. Murphy.  (Doc. 41-4, 0:01-0:03).

Wilkinson several times why he was being detained.  (Doc. 41-4, 1:10 to 1:51).

Officer Wilkinson asked Mr. Murphy to spell his name, and Mr. Murphy held up his

phone and said, "Let me call my mom."  Officer Wilkinson replied, "Okay, go

ahead."  (Doc. 41-4, 1:52 to 1:57).  While Mr. Murphy called his mother, Officer

Wilkinson spoke "10-71" into his radio, requesting backup.  (Doc. 41-4, 2:02; Doc.

41-1, p. 26).

Officer Wilkinson again asked Mr. Murphy to cooperate.  Mr. Murphy spelled

his name and provided his year of birth.  (Doc. 41-4, 2:33-2:34).  Officer Wilkinson

radioed a dispatcher to verify the information.  (Doc. 41-4, 3:00 to 3:40).  While Mr.

Murphy was on the phone with his mother, Officer Wilkinson reminded him to keep

his hand out of his pocket; Mr. Murphy complied.  (Doc. 41-4, 3:55-3:58).  Mr.

Murphy spoke with his mom, explained the situation, and told his mom that he

needed his ID.  Mr. Murphy stated that he was right around the corner.  (Doc. 41-4,

4:00-5:05).

Officer Chambless arrived, exited his vehicle, and walked towards Officer

Wilkinson and Mr. Murphy, stopping a few feet from Mr. Murphy.  (Doc. 41-4,

5:22-5:26).[3]  Officer Wilkinson asked Mr. Murphy:  "Do you want to get off the

phone and talk to us now?"  (Doc. 41-4, 5:25; Doc. 41-5, 0:11).  Officer Chambless

---

[3] In his deposition, Mr. Murphy testified that Officer Chambless "hopped out of the truck and like ran towards me and tried to tackle me."  (Doc. 41-3, p. 18, tp. 67; Doc. 41-3, p. 19, tp. 70). Bodycam footage contradicts Mr. Murphy's recollection.

asked Mr. Murphy how old he was; Mr. Murphy stated that he was 20. (Doc. 41-4, 5:39-5:43). Officer Wilkson reached for Mr. Murphy's right arm, advised Mr. Murphy that he was going to pat him down, and stated: "just stay where you're at." (Doc. 41-4, 5:41-5:45; Doc. 41-5, 0:28).[4] Mr. Murphy began screaming. (Doc. 41-4, 5:46; Doc. 41-5, 0:39).[5] Mr. Murphy yelled: "Get off of me, get off, get off of me." (Doc. 41-4, 6:06; Doc. 41-5, 1:01). Officer Wilkinson instructed Mr. Murphy repeatedly to stop resisting. (Doc. 41-4, 6:15). Officer Chambless commanded Mr. Murphy to put his hands behind his back. (Doc. 41-4, 6:19; Doc. 41-5, 1:03). As Mr. Murphy struggled, he, Officer Wilkinson, and Officer Chambless fell to the ground. (Doc. 41-1, p. 38, 43 & 44; Doc. 41-2, p. 38).

Mr. Murphy yelled: "Why are you hurting me?" (Doc. 41-5, 1:19; Doc. 41-6, 0:15-0:16). An officer commanded: "put your fucking head on the ground." (Doc. 41-5, 1:21; Doc. 41-6, 0:16-0:18). Mr. Murphy yelled: "Why are you hitting me?" (Doc. 41-4, 6:32-6:35). Officer Chambless reported that he was striking Mr. Murphy with "hard empty hand strikes" near Mr. Murphy's kidneys to try to get him to remove his left arm from the area near his waistband. (Doc. 41-1, p. 56; Doc. 41-

---

[4] In his deposition, Mr. Murphy testified that Officer Wilkinson ran towards him. (Doc. 41-3, p. 18, tp. 67). Bodycam footage contradicts Mr. Murphy's recollection. Mr. Murphy testified that Officer Wilkinson did not notify him that he was going to pat him down. (Doc. 41-3, p. 18, tp. 69). Bodycam footage contradicts Mr. Murphy's recollection.

[5] In his deposition, Mr. Murphy testified that when Officer Wilkinson reached for his arm, he "didn't react," and he did not scream. (Doc. 41-3, p. 19, tpp. 70-71). Bodycam footage contradicts Mr. Murphy's recollection.

2, p. 39; Doc. 41-5, 7:49-8:05 (Officer Chambless stating to two other officers that he had to complete a use of force report because he gave Mr. Murphy "some licks to the kidney."); Doc. 41-7, 6:17-6:23 (same)). Officer Chambless instructed Mr. Murphy to "calm down," but Mr. Murphy continued to struggle. (Doc. 41-4, 6:45-5:48; Doc. 41-6, 0:27).

Officer Brett Pace arrived and tried to assist Officers Wilkinson and Chambless as they tried to restrain Mr. Murphy. (Doc. 41-6, 0:00 to 0:31). One officer instructed another to grab Mr. Murphy's hand, and the officer responded: "I'm trying." (Doc. 41-5, 1:25-1:27). Officer Wilkinson stated that he got one cuff on Mr. Murphy. (Doc. 41-5, 1:30). Mr. Murphy continued yelling and telling the officers to get off him. (Doc. 41-5, 1:50-55). Mr. Murphy's mother arrived and began yelling at him to stop struggling. (Doc. 41-4, 7:01-06, 7:24; Doc. 41-5, 2:10).

Officer Chambless instructed Mr. Murphy to "put [his] fucking hands behind his back" while he tried to cuff Mr. Murphy's free hand. (41-4, 7:16; Doc. 41-5, 1:58-2:02). Officer McCreless arrived and joined the effort to restrain Mr. Murphy. (41-7, 0:28 to 0:47)). The officers attempted to secure Mr. Murphy's free hand while Mr. Murphy grasped something in that hand. (Doc. 41-6, 0:11-0:12; Doc. 41-7, 56).[6]

---

[6] Mr. Murphy testified in his deposition that he did not resist the pat-down. (Doc. 41-3, p. 22, tp. 83). Bodycam footage contradicts his testimony.

One officer forced Mr. Murphy's closed fist open, and a small bag of marijuana fell from Mr. Murphy's hand.  (Doc. 41-7, 0:58 to 1:07; *see also* Doc. 41-5, 2:39; Doc. 41-5, 7:35 (officer stating: "We have a bag of weed" and indicating that Mr. Murphy would be charged with "POM 2nd"); Doc. 41-7, 6:07).[7]

Three officers worked together to secure Mr. Murphy's hands in cuffs behind his back.  (Doc. 41-5, 2:20).  Another officer called medics to examine Officer Wilkinson's possible broken hand.  (Doc. 41-4, 8:33, 10:15-10:47; *see* Doc. 41-1, pp. 39-40; Doc. 41-5, 2:45).[8]

Two officers tried to raise Mr. Murphy to his feet.  (Doc. 41-5, 2:50; Doc. 41-7).  Officer McCreless's bodycam reveals a scrape on Mr. Murphy's left temple.  (Doc. 41-7, 1:21).  Footage from Officer Chambless's bodycam shows officers carrying Mr. Murphy to a patrol car.  (Doc. 41-5, 2:55-3:15; *see also* Doc. 41-6, 2:00-2:10 (showing Mr. Murphy being held upright by two officers while his feet dragged)).  Mr. Murphy testified that he could not walk because his legs hurt after one of the officers knelt on them while the other officers tried to place him in handcuffs.  (Doc. 41-3, pp. 20-21, tpp. 77-78).  Mr. Murphy's mother yelled to the officers that her son "has Crohn's."  (Doc. 41-4, 7:20; Doc. 41-7, 2:37).

---

[7] Officer Pace took possession of the marijuana and placed it in his patrol vehicle.  (Doc. 41-6, 9:07-9:08).

[8] Additional officers had arrived on the scene.

Officers patted Mr. Murphy down before they placed him in a patrol SUV. (Doc. 41-6, 2:17-2:26).  Officer Chambless and Officer McCreless tried to place Mr. Murphy in the SUV, but Mr. Murphy struggled against them.  (Doc. 41-6, 2:39-2:50).[9]  Mr. Murphy remembers officers slamming his head on the top of the doorway of the truck's rear seat.  (Doc. 41-3, p. 21, tp. 79, lines 11-16).

It took two officers approximately 40 seconds to seat Mr. Murphy in the patrol vehicle.  (Doc. 41-5, 2:35-3:17).  Once Mr. Murphy was in the police SUV, Officer Chambless pepper-sprayed him.  (Doc. 41-3, p. 24, tp. 93).  Officer Chambless stated that he used pepper spray because Mr. Murphy "wouldn't get in the car."  (Doc. 41-5, 7:49-8:05; *see also* Doc. 41-5, 4:51, 5:44; Doc. 41-7, 3:24, 3:38, 6:17-6:23, 6:33-6:34).  Mr. Murphy yelled that he could not breathe.  (Doc. 41-5, 8:00-8:25; Doc. 41-7, 3:53).  Mr. Murphy's mother asked Officer McCreless to let Mr. Murphy get some air.  (Doc. 41-7, 3:48).  Officer McCreless lowered the windows in the patrol vehicle and turned on the air conditioning.  (Doc. 41-7, 4:04-4:24).  Officers McCreless and Chambless drove Mr. Murphy to the Hoover police station.  (Doc. 41-7, 7:51).  Mr. Murphy continued yelling that he could not breathe.  (Doc. 41-7,

---

[9] Mr. Murphy testified in his deposition that he did not resist when officers tried to seat him in a patrol vehicle.  (Doc. 41-3, p. 21, tp. 80).  Bodycam footage contradicts his testimony.

8:25-27).  Mr. Murphy arrived at the Hoover jail at 2:00 a.m.  (Doc. 41-3, p. 10, tp. 37).

When Mr. Murphy left the Hoover jail at 10:00 a.m., his mother took him to the emergency room to receive treatment for hand, face, mouth, and leg injuries. (Doc. 41-3, pp. 10-11, tpp. 36- 40).

## III.

To recover damages for his injuries, Mr. Murphy has sued the four Hoover police officers who were involved in the effort to restrain him.  (Doc. 8).  Mr. Murphy contends that the officers, in their individual capacities, used excessive force to restrain him in violation of the Fourth Amendment of the United States Constitution.  (Doc. 8, p. 1).  Mr. Murphy asserts his constitutional claim pursuant to 42 U.S.C. § 1983.  (Doc. 8, p. 1).  The officers contend that by law, they are immune from Mr. Murphy's damages claims.  (Doc. 43).

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions[ ] generally are shielded from liability [or suit] for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Mr. Murphy acknowledges that Officers Wilkinson,

Chambless, Pace, and McCreless were acting within the scope of their discretionary authority when they stopped and eventually arrested him.  (Doc. 47, p. 15).  After a plaintiff has acknowledged, or a government official has demonstrated, "'that the conduct at issue falls within the discretionary job responsibilities of the officer, a plaintiff must meet two requirements before qualified immunity may be rejected.'" *Wade*, 13 F.4th at 1225 (quoting *Hall v. Flournoy*, 975 F.3d 1269, 1275 (11th Cir. 2020)).  A plaintiff "must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).

Accordingly, the Court first examines whether the evidence concerning a constitutional violation is disputed.  In a Fourth Amendment excessive force case, a district court must determine whether the officer's conduct was "'objectively reasonable in light of the facts confronting the officer.'"  *Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1339 (11th Cir. 2020) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)).  A district court does not "view an officer's actions with the 20/20 vision of hindsight," and a court must "make special allowance" for the "tense, uncertain, and rapidly evolving situations" in which an officer must decide how to proceed.  *Shaw*, 884 F.3d at 1100 (quotations and citations omitted).  "When an officer permissibly makes an arrest or investigatory stop, he may use "some degree of physical coercion or threat thereof to effect it."  *Patel*, 959 F.3d at

11

1339 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "Whether an officer has used excessive force depends on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (quoting *Graham*, 490 U.S. at 396).  The Eleventh Circuit has held that district courts also may consider the need for force, the degree of force used relative to the need, and the severity of the plaintiff's injuries.  *Patel*, 959 F.3d at 1339.

In this case, the officers had little information about the severity of Mr. Murphy's crime until they were on the ground with him, trying to place him in handcuffs.  In the minutes leading to the officers' struggle with Mr. Murphy, shortly before 1:00 a.m., Officer Wilkinson saw Mr. Murphy walking behind an apartment building.  (Doc. 41-2, pp. 53-54).  Officer Wilkinson found the 1:00 a.m. outing unusual and suspicious, as would a reasonable officer, so he was authorized to make an investigatory stop.  (Doc. 41-1, p. 25).  To be sure, as Mr. Murphy argues, it is not a crime to go for a walk outside after midnight, (Doc. 41-3, p. 14, tp. 51:5-14), but it was reasonable for Officer Wilkinson to opt to question Mr. Murphy, particularly given the fact that Officer Wilkinson observed Mr. Murphy coming from the rear of an apartment building, and he smelled marijuana in the area, (Doc. 41-1,

pp. 14-16).  *U.S. v. Arvizu*, 534 U.S. 266, 273, 276-77 (2002) (explaining that law enforcement officer may make a brief investigatory stop if the totality of the circumstances creates reasonable suspicion that criminal activity may be afoot, officer may assess a situation "in light of his specialized training and familiarity with the customs of the area's inhabitants," and officer "need not rule out the possibility of innocent conduct") (internal marks and citations omitted).[10]

As a reasonable officer would be apt to do, Officer Wilkinson became more suspicious when Mr. Murphy was unable to provide identification, (Doc. 41-4, 0:17-0:20), and avoided Officer Wilkinson's request for his name, (Doc. 41-4, 0:37 to 0:42).  At this point, several minutes into the investigatory stop, neither Officer Wilkinson nor Officer Chambless, who had arrived on the scene, (Doc. 41-4, 5:22-5:26), had information that would allow them to charge Mr. Murphy with a crime, but under the circumstances that confronted Officers Wilkinson and Chambless, a reasonable officer could opt to conduct a pat down for officer safety.  *Terry v. Ohio*, 392 U.S. 1, 26-27 (1968).

Video footage of the pat down indicates that Officer Wilkinson stated audibly that he was about to conduct a pat down, asked Mr. Murphy to stay still, and reached for Mr. Murphy's arm.  (Doc. 41-4, 5:41-5:45; Doc. 41-5, 0:28).  There is no

---

[10] Officer Wilkinson testified that when he got out of his patrol vehicle and approached Mr. Murphy, he smelled raw marijuana "coming off of him."  (Doc. 41-1, p. 17).

evidence that Officer Wilkinson grabbed Mr. Murphy's arm forcefully or otherwise attempted to use force to conduct a pat down.

When Officer Wilkinson grasped Mr. Murphy's arm to begin a pat down, Mr. Murphy resisted verbally and physically.  (Doc. 41-4, 5:46-6:15; Doc. 41-5, 0:39-1:01).  Officer Chambless commanded Mr. Murphy to put his hands behind his back.  (Doc. 41-4, 6:19; Doc. 41-5, 1:03).   As Mr. Murphy struggled, he, Officer Wilkinson, and Officer Chambless fell to the ground.  (Doc. 41-1, p. 38, 43 & 44; Doc. 41-2, p. 38).  While Officers Wilkinson and Chambless wrestled to gain control of Mr. Murphy on the ground, Officer Chambless struck Mr. Murphy in the back several times with "hard empty hand strikes," reportedly to get Mr. Murphy to remove his left arm from the area near his waistband.  (Doc. 41-1, p. 56; Doc. 41-2, p. 39; Doc. 41-5, 7:49-8:05; Doc. 41-7, 6:17-6:23).   Throughout, Mr. Murphy struggled, so much so that when two other officers arrived and joined the effort to restrain him, the four officers were not able to place Mr. Murphy in handcuffs.  (Doc. 41-4, 6:45-7:16; Doc. 41-5, 1:25-2:02; Doc. 41-6, 0:00 to 0:47).  Mr. Murphy's mother arrived and began yelling at him to stop struggling.  (Doc. 41-4, 7:01-06, 7:24; Doc. 41-5, 2:10).  When one of the officers forced Mr. Murphy's closed fist open, a small bag of marijuana fell from Mr. Murphy's hand, enough to support a charge of second-degree possession of marijuana.  (Doc. 41-7, 0:58 to 1:07, 6:07; *see also* Doc. 41-5, 2:39, 7:35).  Officer Wilkinson injured his hand in the struggle

and needed medical attention at the scene.  (Doc. 41-4, 8:33, 10:15-10:47; *see* Doc. 41-1, pp. 39-40; Doc. 41-5, 2:45).  As a result of the struggle on the ground, Mr. Murphy sustained a scrape on his left temple, (Doc. 41-7, 1:21), and he contends that officers hurt his legs in the struggle when they kneeled on him, (Doc. 41-3, pp. 20-21, tpp. 77-78).

At this juncture, on these facts and circumstances, the force the officers used was reasonable.  Until Mr. Murphy opened his fist and revealed a bag of marijuana, the officers did not know why Mr. Murphy was struggling vigorously to avoid restraint.  Officers did not know whether Mr. Murphy had a weapon, and it was reasonable for them to attempt to restrain him and determine why he resisted a pat down.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (reiterating the principle that the "'calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'") (quoting *Graham*, 490 U.S. at 396-97).  It took four officers just over two minutes to control Mr. Murphy's arms enough to place him in handcuffs.  Though in hindsight the crime with which Mr. Murphy was charged was

minor, a reasonable officer would have suspected that Mr. Murphy was engaged in more serious conduct, given his level of resistance.[11]

It was reasonable for an officer to force open Mr. Murphy's clenched fist to determine what he was grasping and trying to keep from law enforcement. Similarly, it was reasonable for Officer Chambless to strike Mr. Murphy in the back as Mr. Murphy reached for his waist because he could have been reaching for a weapon. The degree of force the officers used was proportional to Mr. Murphy's resistance, and Mr. Murphy's injuries were relatively minor, especially in comparison to Officer Wilkinson's injury. *Duncan v. Wade*, 851 Fed. Appx. 959 (11th Cir. 2021).

Jurors could conclude that, after the officers restrained Mr. Murphy in handcuffs, Officers Chambless and Officer McCreless used excessive force when they tried to place Mr. Murphy in a police SUV. (Doc. 41-6, 2:39-2:50). Video evidence reveals that Mr. Murphy resisted the officers' efforts to seat him in the patrol vehicle, but the video evidence does not confirm or disprove Mr. Murphy's contention that Officers Chambless and Officer McCreless slammed his head on the top of the vehicle's doorway. (Doc. 41-3, p. 21, tp. 79, lines 11-16). If they did, the force exceeded the force two reasonable officers would use to maneuver a handcuffed man into a police vehicle. *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th

---

[11] Mr. Murphy was charged with second-degree marijuana possession and with resisting arrest and obstructing governmental operations. The charges are pending. (Doc. 41-1, p. 50, lines 1–11).

Cir. 2002) (finding that police officer used excessive force by slamming the plaintiff's head onto the trunk of her car when she was handcuffed, not posing a threat to the officer, and not posing a flight risk); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (force was excessive where officers kicked handcuffed and non-resisting defendant in the ribs and beat his head on the ground). Additionally, once Mr. Murphy was in the police vehicle, Officer Chambless pepper-sprayed him. (Doc. 41-3, p. 24, tp. 93; Doc. 41-5, 7:49-8:05; *see also* Doc. 41-5, 4:51, 5:44; Doc. 41-7, 3:24, 3:38, 6:17-6:23, 6:33-6:34). Officer Chambless asserted that Mr. Murphy was trying to get out of the car, but the video evidence does not confirm or disprove the assertion, and Mr. Murphy testified that he was not resisting the officers. (Doc. 41-3, pp. 19-24). The disputed facts surrounding Officer Chambless's use of pepper spray create a jury question concerning the force used after Mr. Murphy was seated in the patrol unit.

To this point then, the Court will enter judgment for Officers Wilkinson and Pace on Mr. Murphy's excessive force claim against them because those officers are immune from his claim. The Court moves to the next step of the qualfied immunity analysis with respect to Mr. Murphy's claims against Officers Chambless and Officer McCreless.

At this step, the Court must determine whether Mr. Murphy's right to be free from excessive force under the circumstances of this case was clearly established

when Officers Chambless and Officer McCreless allegedly slammed Mr. Murphy's head against the door frame of a police vehicle while he was handcuffed and when Officer Chambless pepper-sprayed Mr. Murphy while he was cuffed in the back seat of the vehicle.

> A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U. S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (*per curiam*) (internal quotation marks omitted). Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." [*White v. Pauly*, 580 U. S., at 79, 137 S.Ct. 548, 551 2017)] (alterations and internal quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (internal quotation marks omitted).

> "[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12, 136 S.Ct. 305 (alterations and internal quotation marks omitted).

*Rivas-Villegas*, 142 S. Ct. at 7-8.

As noted above, the Eleventh Circuit's 2002 decision in *Lee v. Ferraro* clearly established that police officers use unconstitutional force when they slam an arrestee's head into a vehicle after the arrestee is cuffed and no longer a flight risk or a threat to officer safety.  284 F.3d at 1198.  In some respects, *Lee* is factually distinguishable from this case because, under Ms. Lee's version of the events in her

18

case, she was stopped because she honked her horn, and she did not resist the arresting officer. *Lee*, 284 F.3d at 1198. In contrast, video evidence establishes that Mr. Murphy struggled greatly when Officer Wilkinson tried to pat him down, and officers reasonably could suspect that Mr. Murphy was armed or had committed a crime because he resisted the pat down, refused to comply when officers tried to secure his arms behind him, and had to be forced to open one of his fists. Still, these factual differences do not diminish the notice that *Lee* provides that a reasonable officer cannot possibly believe that he has "lawful authority" to slam an individual's head against a vehicle "*after* []he was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed." *Lee*, 284 F.3d at 1199 (emphasis in *Lee*).[12]

Video evidence establishes that Mr. Murphy's hands were secured in cuffs before Officers Chambless and McCreless carried him to a patrol vehicle, and under Mr. Murphy's version of events, he was not a flight risk because his legs were injured from his struggle with officers. (Doc. 41-3, p. 21, tp. 78). While cuffed and injured, he did not pose a risk of harm to the two officers who were able to carry him to the patrol vehicle. In addition, at this point, Mr. Murphy was under arrest for possessing

---

[12] *See Marsh v. Butler County, Ala.*, 238 F.3d 1014, 1031 (11th Cir. 2001) ("Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law.").

a small quantity of marijuana, a relatively minor offense.  If Mr. Murphy can prove his version of the facts, then *Lee* precludes the officers from avoiding liability based on the affirmative defense of qualified immunity for their conduct after Mr. Murphy's arms were restrained in handcuffs and his legs were injured.

Likewise, under Mr. Murphy's version of events, Officer Chambless cannot rely on qualified immunity to avoid Mr. Murphy's excessive force claim as it relates to Officer Chambless's use of pepper spray after Mr. Murphy was seated in the patrol vehicle.  In 2002, the Eleventh Circuit Court of Appeals held that where an arrestee seated in handcuffs in the back of a patrol vehicle was "screaming and using foul language," she was "a nuisance but not a threat" to the arresting officer, and the officer's use of pepper spray to subdue the arrestee was "'plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*.'"  *Vinyard*, 311 F.3d at 1348 (quoting *Lee*, 284 F.3d at 1198).  The Eleventh Circuit explained:

> using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else. Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. Furthermore, " 'as a means of imposing force, pepper spray is generally of limited intrusiveness,' and it is 'designed to disable a suspect without causing permanent physical injury.' " *Gainor v. Douglas County,* 59 F.Supp.2d 1259, 1287 (N.D.Ga.1998) (quoting *Griffin v. City of Clanton,* 932 F.Supp. 1359, 1369 (M.D.Ala.1996)). Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.

311 F.3d at 1348 (footnotes omitted).

Here, as in *Vinyard*, once Mr. Murphy was in the back of the patrol vehicle in handcuffs, it was unreasonable for Officer Chambless to use pepper spray. Even though Mr. Murphy had resisted arrest and struggled to avoid being seated in the patrol vehicle, once he was in the vehicle, under Mr. Murphy's version of events, he was "screaming and hollering," (Doc. 41-3, p. 24, tp. 91), but he did not try to leave the vehicle or resist in any way, (Doc. 41-3, pp. 24-25, tpp. 93-94). As noted, Mr. Murphy was under arrest for a minor drug possession offense. Thus, the facts of Mr. Murphy's case, viewed in the light most favorable to him, align sufficiently with the facts in *Vinyard* to give Officer Chambless notice that his use of pepper spray under the circumstances exceeded constitutional bounds.

## IV.

For the reasons discussed above, based on qualified immunity, the Court enters judgment for Officers Wilkinson and Pace on Mr. Murphy's excessive force claim against them. The Court finds that Officers Chambless and McCreless are not entitled to qualified immunity as a matter of law. By separate order, the Court will set Mr. Murphy's excessive force claims against Officers Chambless and McCreless for trial.

**DONE** and **ORDERED** this May 3, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE